**David White Pro Per**
155 W. Angus Rd.
Queen Creek AZ 85143
Billcoll01@aol.com
(480)235-8771

FILED ___ LODGED
___ RECEIVED ___ COPY

OCT 0 1 2024

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

DAVID ALLEN WHITE

  Plaintiff,

v.

FOUR PEAKS BREWING COMPANY

  Defendant.

Case No. CV24-02633-PHX-ASB

COMPLAINT AND JURY DEMAND

## INTRODUCTION

Comes the Plaintiff David White and complains as follows and brings tort claims against Defendant, Four Peaks Brewing Company and for a violation of the Electronic Communications Privacy Act of 1986 (ECPA) and Plaintiff accuses Four Peaks Brewing Company of Intrusion upon seclusion and Negligent hiring, retention or supervision.

The ECPA and Computer Fraud and Abuse Act (CFAA) either considered together or separately form an objectively reasonable expectation of privacy, even in public relative to contents and activities on computer devices, especially relative to other devices. Congress outlined three exceptions and defenses in the ECPA being:

1

*1.) law enforcement with a warrant or exigent circumstances*

*2.) telecommunications employees responding to law enforcement with a warrant or exigent circumstances and*

*3.) bona fide accidental or otherwise unintentional intrusion*

Neither of which obtain here.

One of the most concerning issues facing Americans is privacy and identity theft. Almost daily, we witness advancements in digital technology, especially surveillance camera related technology. For example, surveillance cameras in many modern big box retail stores are capable of facial recognition as well as reading barcodes as small as two inches of shoplifted items as they are being stolen. Manufacturers and retail installers of such equipment provide warnings against using the equipment for unlawful purposes, and specifically point out wiretap laws. Plaintiff will demonstrate with documentary evidence and witness testimony that Defendant, Four Peaks Brewing Company, utilized their security equipment, specifically their surveillance cameras intentionally and with forethought, to covertly access or endeavor to access information, electronic communications and other data from Plaintiff's password protected computer device without legal authority to do so, and most importantly, without Plaintiff's knowledge and consent.  Plaintiff will further demonstrate that subsequently, at least some of the information illegally gathered was maliciously used to publicly humiliate him. Plaintiff will demonstrate that during the intrusion, he was actively engaged in several private, privileged and protected electronic communications, all of which, neither Four Peaks Brewing Company nor any of its employees were a party. Plaintiff also admittedly accessed data such as his private

2

photo gallery and confidential documents without knowledge that his private content was being intercepted and recorded by Defendant's device. The court will hear Sean Snelling, Four Peaks general manager, gleefully admit that the business condones & encourages its employees to spy on devices. The court will hear Snelling state that he will do so until "a police officer tells me it is not legal". The court will then hear Snelling refuse to accept Mr. White's offer of statutory information on the federal and state wiretap laws. Mr. White reported the state wiretap felony to the Tempe Police Department. The court will hear Snelling quickly confess to law enforcement that their employees had intentionally intercepted plaintiff's computer device without authorization and without consent. Instead of investigating this class 5 felony that the Arizona legislature deemed to rise to the level of assault on a police officer, officer Anthony Burke, who has been rated by his superiors as a poor investigator, decided to use his position as a police officer with the Tempe Arizona Police Department not to enforce the law of the land and protect Plaintiff's legal rights, but instead to act as an agent for Four Peaks. The court will hear officer Burke attempt to coerce Mr. White into not pursuing felony charges against the individual employees of Four Peaks that engaged in the acts described herein with threats of bogus criminal charges against Mr. White. When Mr. White refused to back down, Officer Burke failed to perform any investigation whatsoever, and determined, without consulting with any government Attorney, that no crime could be identified, and simply dropped the case despite a full confession from Defendant. The court will hear Defendant describe that the reasoning for the intrusion was to determine whether, almost an hour previously, Plaintiff had taken photographs of the buttocks

of the staff from his position seated at a high-top table, that, even if true, would not, in in any way, be illegal or against any posted policy of the establishment. Importantly, curiosity is an unlawful justification under the definitions of the ECPA. In fact, Mr. White attempted to convey to Defendant and later law enforcement, that even if he was conducting unlawful activities on his device, Defendant would still not have legal authorization to intercept information from his device. Mr. White went on to explain that even law enforcement would be required to obtain a warrant to conduct such activities. The court will hear Snelling further allege to officer Burke that several staff members actually witnessed Mr. White engaging in inappropriate behavior in real time but, nonetheless, did and said nothing. Instead, they allegedly spent close to an hour reviewing camera footage of an event they allege just happened moments before. If this were indeed true, as with most states, Arizona has more than adequate and robust trespassing laws that would have allowed Four Peaks to simply ask Mr. White to leave the premises. The absurd notion that it allegedly took them approximately one hour to confirm that Mr. White had, in fact, taken completely legal photographs, will be de-bunked. Evidence will reveal a much more sinister motive of attempted identity theft via wiretapping and computer intrusion. In fact, evidence will show that the employee could have confirmed Plaintiff's public photography in a matter of seconds. Regardless, the wiretap law requires no specific motive *see Abraham v. Cty. of Greenville, 237 F.3d 386, 391-92 (4th Cir. 2001) (jury instruction that "defendant's motive is not relevant" to determine intent under the Wiretap Act was proper))* The Wiretap Act only requires a plaintiff bringing a civil action to establish that the defendant intentionally intercepted,

attempted to intercept, or procured any person to intercept any wire, oral, or electronic communication pursuant to
(18 U.S.C. § 2511(1)(a)).

The statute defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication" by using any Electronic device, Mechanical device or Other device. (18 U.S.C. § 2510(4).

The wiretap law also requires that interception occurs contemporaneously with the communication's transmission

Finally *see Boudreau v. Lussier, 901 F.3d 65, 77 (1st Cir. 2018) (citing Luis v. Zang, 833 F.3d 619, 628 (6th Cir. 2016). To be liable under the Wiretap Act, a defendant must have purposely or consciously wanted to cause a result. (S. REP. NO. 99-541 (1986).)*

All elements are present here.

Mr. White made no secret that he was taking photographs, and "smart phones" are not generally known for ease of use as spy cameras. Whatever Defendant's employees *allegedly thought they saw*, would have been observed while in the midst of committing a state and federal felony, a misdemeanor violation of Computer Fraud and Abuse Act and various torts against Mr. White. Defendant then escalated from a simple tort to public humiliation by loudly confronting Mr. White in front of his guests and nearby patrons. Evidence will definitively demonstrate that Defendant admittedly spies on its customer's electronic devices on some regular basis. The court will hear in vivid surround sound that Defendant will continue to spy on customer devices until "a police officer tells" them that it is not legal to invade the privacy of customers. What is maybe most disturbing, is that Four Peaks wouldn't simply take that notion as common sense and

even doubled down by adding their glowing endorsement of their employees' public humiliation of a customer. Since local law enforcement refuses to hold Defendant accountable for their felonious and tortious activities, Plaintiff will hold them accountable with civil remedies in this court on behalf of himself and in the spirit of other victims that most likely, have no clue that they have been victimized by Four Peaks and its employees in similar ways before and since Mr. White was victimized, some possibly suffering financial and/or intellectual harm as a result. It may be a blessing in disguise to future customers that the employee(s) in this case allowed their ego(s) to beat common sense to the station.

## PARTIES

Plaintiff, David White is and was, at all times relevant, a citizen of the United States of America, specifically the State of Arizona and is a resident of Pinal County.

Defendant, Four Peaks Brewing Company is an independently operated, but fully owned subsidiary of AB-Inbev USA. Defendant is engaged in the business of producing low alcohol beverages and operates a "pub" at 1340 E 8th St #104, Tempe, AZ 85281 (Maricopa County) where they sell food and beverage products.

## JURISDICTION AND VENUE

This court has jurisdiction to grant relief pursuant to 28 U.S.C. § 1331 and Venue for the action is proper as all parties are located in the District of Arizona

## JURY DEMAND

Plaintiff demands trial by jury.

# FACTUAL ALLEGATIONS

On April 16, 2023, David White, the Plaintiff, met lunch guests at Four Peaks Brewing Company's pub located at 1340 E 8th St #104, Tempe, AZ 85281. Upon arrival, he secured a high-top table approximately two feet to the left of the patio entrance. While waiting for his guests, who informed him of a delay in their arrival via text messages, Mr. White positioned himself against the wall. During the approximately one hour wait, he engaged in various activities on his iPhone using a cellular connection. These activities included taking photos of the bar for social media, emailing, viewing private photos and documents, sending and receiving private text messages, private messaging on social media, accessing his restricted social media feeds, and logging into password-protected accounts, including his bank accounts. When Mr. White's lunch guests, Tara White (his daughter) and Daniel Huerta, arrived, Mr. White requested a larger table. During the move to the new table, Mr. White closed out his tab at the original table and left a generous tip for the waiter. He then opened a new tab at the new table.

Mr. White and his guests spent approximately an hour enjoying drinks, followed by lunch and a round of after-meal drinks.

About an hour after moving to the new table, Mr. White was approached by two employees, one male and one female. The male employee stood back approximately 10-15 feet away and remained silent during the interaction. The female employee informed Mr. White that he had been taking pictures of the staff without permission and that he was being asked to leave and to never return. Mr. White explained that he had only taken photos of the bar and offered to show her the photo that he had kept. The

employee declined to view the photo, stating, "we were watching everything you were doing on your phone since you walked in," and reiterated that Mr. White needed to leave. She then offered to process his payment for the lunch tab. While waiting for the receipt, Mr. White tried to explain the situation to his guests, despite not fully understanding it himself. He felt extremely humiliated as his daughter and her friend looked on and he noticed nearby patrons had began to take notice. When the female employee returned with his credit card and receipt, she attempted to hasten his departure by loudly threatening to call law enforcement. Amid snickers from nearby patrons and the look of shock and utter dismay on his daughter's face, Mr. White encouraged her to call law enforcement, stating, "We'll see who leaves in handcuffs," alluding to the felony she had just admitted to committing. The employee immediately ceased her attempts to intimidate Mr. White and did not contact law enforcement. However, as Mr. White finished his drink, the staff member, aiming to further humiliate him, focused on encouraging Mr. White's guests to stay, stating that only he had to leave. The staff had also separated Mr. White's portion of the tab without informing him or his guests, leading him to believe he had paid for the entire table. After finishing his drink, the female employee offered to fill Mr. White's growler, which he had brought with him. Mr. White declined, and he and his party left without incident.

On April 17, 2023, Mr. White, believing that the management was unaware that weekend employees were using security equipment to spy on customers' electronic devices, communications, and digital activities, contacted the manager by phone. General Manager Sean Snelling quickly informed Mr. White that not only was the business aware of this activity,

8

but it was also condoned. Snelling stated that it would continue until screenshotting devices until "a police officer tells me it's not legal." He argued that merely having an electronic device out made its contents public display and available for prying eyes and devices. Mr. White then attempted to cite the applicable statutes that classified the activity as a state and federal felony. However, Snelling dismissed this offer of information, insisting that he would only stop if instructed by a police officer.

Mr. White found Four Peaks' arrogance and cavalier attitude towards privacy laws and common decency deeply disturbing. He decided to report the incident to law enforcement, hoping they would put an end to the unlawful surveillance of customers. Mr. White contacted the Tempe, Arizona Police Department on their non-emergency line, as they had jurisdiction. When he reported the felony, the dispatch agent expressed uncertainty about what could be done but assured him that an officer would follow up.

Eventually, Mr. White spoke with Officer Anthony Burke, who, a few months later, would be evaluated by his supervisors as having substandard investigative skills. Mr. White provided Officer Burke with details of the incident, including Arizona Revised Statutes § 13-3005, which classifies the interception or attempted interception of electronic communications as a Class 5 felony. Mr. White also specifically shared his concerns of the identity theft red flags in the situation, especially the timeline. Officer Burke acknowledged the unusual nature of the situation and stated that he would contact Four Peaks.

Officer Burke contacted Snelling by telephone and recorded the conversation. Snelling immediately admitted to viewing Mr. White's

activities on his device, as recorded by his employees the previous day. He claimed this was done to confirm that Mr. White had taken photographs of several staff members' buttocks. Snelling alleged that he had seen and confirmed that Mr. White's device, while he was seated at a high-top table, had captured images of staff members' buttocks. Even if true, these photographs would not be unlawful or against any posted rules or policies of the business.

Similarly to identity theft, curiosity does not constitute a lawful exception under the Wiretap Act or the Computer Fraud and Abuse Act. Snelling also claimed that several staff members had actually witnessed Mr. White taking these photos almost an hour before the confrontation, however did not explain why Mr. White wasn't simply asked to leave at that time and officer Burke did not ask.

Snelling reiterated, without mentioning that the wiretap activity was a regular occurrence held that Mr. White's having the device out of his pocket made it "on public display," including to a camera covertly zooming in on the device.  Officer Burke appeared to agree and concluded his investigation without seeking legal advice on wiretap laws, obtaining or viewing the video footage, interviewing the employees involved, or even obtaining their names. In essence, law enforcement failed to conduct any meaningful investigation into the wiretap law violation, despite a confession.

Officer Burke then contacted Mr. White, who asked if they could speak at a different time as he was busy meeting with a client. Mr. White also has a policy of recording interactions with police officers. Burke refused, stating he just had a brief update. With his body worn camera running, Burke

10

insinuated that he was currently viewing video evidence and claimed that Mr. White had, in fact, taken photographs of staff members' buttocks, then stating, "From what I am looking at, you are the only one that committed a crime." Burke quoted ARS § 13-3019, which prohibits capturing or allowing the viewing of a person's genitalia, buttocks, or female breast, whether clothed or unclothed, but omitted the clause, *"that is not otherwise visible to the public."*

Burke also warned Mr. White that if he pursued charges against Four Peaks, he could be charged under ARS § 13-3019. Since Mr. White was in a meeting, he could not continue a candid conversation. Burke refused Mr. White's request to reschedule the conversation for a more convenient time. Mr. White attempted to reason with Burke, urging him to seek advice from the city or county attorney and explaining that curiosity is not a legal exception. However, these efforts were in vain.

Mr. White attempted to report Officer Burke's misconduct, first to his sergeant and then to his lieutenant. Both supported Officer Burke and Snelling's assertion that if a cellular device is out of one's pocket, it is considered on public display to eyes and devices, regardless of the Plaintiff's privacy safeguards. Police officials also questioned whether electronic communications could be visually intercepted, insisting that interception could only occur by "getting into" the device. They argued that screenshotting communications did not constitute interception, and therefore, no investigation would be conducted, nor charges presented to the County Attorney and continually refused to consult with any government attorneys. The Plaintiff was also denied an internal affairs complaint and was informed that the Tempe Police Department has no

policy against victim blaming/shaming or coercion of a complaining victim. When Mr. White persisted, several police officials resorted to personal attacks on Mr. White's character based on the unverified accusations made by Four Peaks. Police officials uniformly stated that what happened to Mr. White was due to "your conduct".

Eventually, in December, 2023, Plaintiff complained to the Tempe City Manager's office, who put him in contact with the police chief's office. The Tempe police department continued to rally around officer Burke's actions, however, did agree to have the incident re-investigated.

In January, 2024, officer Burke finally conducted some semblance of an investigation of the matter in person by attempting to obtain the video footage. Upon arrival at Four Peaks, Burke can be heard telling the manager on duty that Plaintiff was "making a stink with the City Manager's office" and discussing how "gross" Mr. White is over a cup of coffee. The manager advised officer Burke after an approximately thirty second search on the computer that the footage had been deleted, despite the fact that Plaintiff served Four Peaks with an evidence hold notice on October 30, 2023 via certified mail to their registered statutory agent. Additionally, Four Peaks had a legal obligation to preserve the footage as the common law duty to preserve evidence arises at "the moment that litigation is reasonably anticipated", which should have been anticipated the moment that Plaintiff notified Snelling that they had committed a felony and attempted to provide statutory information. Officer Burke's body worn camera did capture how quickly the Four Peaks surveillance equipment's files could be accessed, undermining the absurd notion that almost an hour was spent to verify whether Plaintiff had taken

photographs or not. Officer Burke either did not notice the inconsistency or chose to ignore it, and, nonetheless, ended the second "investigation" without interviewing any involved employees or obtaining their names.

Plaintiff wherefore submits;

### COUNT ONE – WIRETAP ACT (18 U.S.C. §§ 2510)

By reference hereto, Plaintiff hereby incorporates the preceding paragraphs.

A violation of the ECPA occurs where any person "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any electronic communication" or "intentionally discloses, or endeavors to disclose, to any person the contents of any electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of an electronic communication" or "intentionally uses, or endeavors to use, the contents of any electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of an electronic communication." 18 U.S.C. §§ 2511(1)(a), (c) - (d)

18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used for a period of two years.

Defendant had a tortious and criminal intent in (a) obtaining the Private Information, (b) sharing the Private Information with each other and/or others.

Electronic communication means any "transfer[s] of signs, signals, writing, photographs, data, and intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate commerce." 18 U.S.C. § 2510(12). Here, the following communications qualify as "communications" under the ECPA

   A. Text messages
   B. Emails
   C. Communications with Plaintiff's banking institutions
   D. Social media interactions

The contents of Plaintiff's electronic communications were intercepted, or endeavored to be intercepted, recorded, used, and/or disclosed in a manner not authorized by law, in violation of 18 U.S.C. § 2511.

Defendant acted intentionally and maliciously in violating Plaintiffs' rights under the Wiretap Act.

As a direct and proximate result of the violation of Plaintiffs' rights under the Wiretap Act, Plaintiff sustained injuries and is entitled to statutory damages as set forth in Wiretap Act 18 U.S.C. § 2520(c) and punitive damages.

## COUNT TWO – INTRUSION UPON SECLUSION

By reference hereto, Plaintiff hereby incorporates the preceding paragraphs.

*"One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." Restatement (Second) of Torts, § 652B.*

1. As our digital footprints continue to expand, individuals including Plaintiff, have an increased expectation of privacy in their right to control who has access to their information and how it is used.
2. *"Invasion of the right of privacy is not a single tort but consists of four distinct torts,' including '(1) intrusion upon the plaintiff's physical and mental solitude or seclusion; (2) public disclosure of private facts; (3) publicity which places the plaintiff in a false light in the public eye; (4) appropriation, for the defendant's benefit or advantage, of the plaintiff's name or likeness.'" Lovejoy v. Linehan, 161 N.H. 483, 485-86 (N.H. 2011) (quoting Hamberger v. Eastman, 106 N.H. 107, 109 (N.H. 1964))*
3. Plaintiff had an objectively reasonable expectation of privacy concerning the contents of his electronic communications and data.
4. Defendant intentionally intruded upon the solitude and seclusion of Plaintiff's private affairs and concerns by accessing or endeavoring to access information from Plaintiff's password protected computer device without Plaintiff's consent or knowledge.
5. The intrusion is highly offensive to a reasonable person in Plaintiff's position.
6. The intrusion was malicious, oppressive or in reckless disregard of Plaintiff's rights. The intrusion was ultimately used as a basis to intentionally publicly humiliate Plaintiff before his daughter and others within earshot.
7. Defendant is therefore also liable to Plaintiff for punitive damages.

## COUNT THREE - NEGLIGENT HIRING, RETENTION OR SUPERVISION

By reference hereto, Plaintiff hereby incorporates the preceding paragraphs.

Defendant had a duty to properly train and supervise their employees in the use of the company's surveillance equipment in a way that is consistent with the state and Federal laws such as the state and federal Wiretap acts and Computer Fraud and Abuse Act (CFAA) which prohibits unauthorized access to the contents of any computer.

Defendant breached that duty.

Defendant allowed and even condoned their employees to intercept the computer devices on some regular basis.

Defendant, Four Peaks Brewing Company, engaged in employment of improper persons or instrumentalities in work involving risk of harm to others, and/or

Failed to properly supervise those persons, And/or

Gave improper or ambiguous orders of in failing to make proper regulations. And

Permitted, or failed to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon premises or with instrumentalities under their control.

Plaintiff suffered consequent and proximate injuries as a result.

Defendants' conduct was malicious, oppressive or in reckless disregard of Plaintiff's rights.

Defendant is therefore also liable to Plaintiff for punitive damages.

## PUNITIVE DAMAGES

Before the Court may apply Rule 9(g) punitive damages, the Court must understand the applicable law that provides for the recovery of punitive damages in this case. It is clear that Arizona punitive damages law applies to this case. Pursuant to Ariz. R. Civ. P. 9, Punitive damages are appropriate when conduct rises to the level of evil hand guided by an evil mind under Arizona law. The Arizona courts have defined this as truly reprehensible, aggravated, or outrageous conduct that would support a request for punitive damages see *Linthicum v. Nationwide Life Ins. Co., 150 Ariz. 326 (1986); Rawlings v. Apodaca, 151 Ariz. 149 (1986); and White v. Mitchell, 157 Ariz. 523 (App. 1988).* The Arizona Supreme Court in Linthicum decided that, before a jury may award punitive damages, the plaintiff must show clear and convincing evidence of an *"evil mind."* In Rawlings, the Court explained that *"evil mind"* may be found either where a defendant intended to injure the plaintiff, or where a defendant intended no injury but consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others. In White, the Court reiterated that the availability of punitive damages should be restricted to those cases in which the defendant's wrongful conduct was guided by evil motives, that is, where the defendant's *"evil hand"* was guided by an *"evil mind."*

*Rawlings v. Apodaca, 151 Ariz. 149, 162-63 (Ariz. 1986) ("When defendant's motives are shown to be so improper, or its conduct so oppressive, outrageous or intolerable that such an "evil mind" may be inferred, punitive damages may be awarded. Restatement (Second) of Torts § 908(2).")* which goes on to state.

*Important factors to consider when deciding whether a defendant acted with an evil mind include (1) the reprehensibility of defendant's conduct and the severity of the harm likely to result, (2) any harm that has occurred, (3) the duration of the misconduct, (4) the defendant's awareness of the harm or risk of harm*

**Analysis:** The Plaintiff believes it is highly improbable that the defense will present the implausible narrative given to law enforcement, which suggested that the Plaintiff posed such a security threat to the business that Mr. White was left unsupervised for an hour while employees meticulously reviewed footage of an incident that had literally just occurred. However, it is quite likely that the defense will have to admit that the employees' initial intentions were either theft or curiosity. These motives do not meet the threshold of "evil mind, evil hand." Unfortunately, at some point, the employees' intentions escalated from theft or curiosity to the humiliation of Mr. White in front of his daughter. Even assuming the employees were unaware that one of Mr. White's guests was his daughter, they certainly knew they were intentionally humiliating Mr. White in front of friends, family, business associates, and/or even others within earshot, likely lashing out over frustration of being unsuccessful in their original motive of theft.

## PRAYER FOR RELIEF

Plaintiff prays;

1. For the court to enter Judgment for statutory damages of $10,000.00 (ten thousand dollars) against Defendant for violating the ECPA.
2. For the court to enter Judgment against Defendant for punitive damages of $50,000.00 (fifty thousand dollars) due

18

to the sheer maliciousness of defendant's actions and to discourage like conduct in the future.

3. Pre-judgment and post-judgment interest at the highest lawful rate.

4. For the court to declare and find that Defendant committed one or more torts against Plaintiff as described herein and are liable for the resulting harm and

5. For compensatory, special, consequential, hedonic and/or additional punitive damages to be determined at trial, including criminal referral to the office of the Arizona Attorney General and/or the U.S. Attorney's office. And

6. For the court to award such other monetary, equitable, injunctive and declaratory relief as the court deem just and proper including Plaintiff's reasonable costs of suit.

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information,
and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause
unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a
nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have
evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable
opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the
requirements of Rule 11.

19

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

RESPECTFULLY SUBMITTED this 1st day of October, 2024

By: _____
David White
Plaintiff Pro Per